# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


## 13-629


**CLAUDINE LABARRERA, ET UX.**

**VERSUS**

**BOYD GAMING CORPORATION, ET AL.**


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-4096
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of John D. Saunders, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.


**AFFIRMED, AS AMENDED.**


**Gremillion, J., concurs with written reasons.**



**David F. Bienvenu**
**Simon, Peragine**
**1100 Poydras St., 30th Fl.**
**New Orleans, LA 70163**
**(504) 569-2030**
**COUNSEL FOR THIRD PARTY APPELLEE:**
    Lagasse, Inc.
    AmRep, Inc.

Steven Broussard
Attorney at Law
802 South Huntington
Sulphur, LA 70663
(337) 527-7006
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Claudine Labarrera
    Alberto Labarrera

Robert Hugh Murphy
John Herr Musser, V
Murphy, Rogers, Sloss & Gambel
701 Poydras St., Suite 400
New Orleans, LA 70139
(504) 523-0400
COUNSEL FOR DEFENDANTS/APPELLEES:
    Boyd Gaming Corp. d/b/a Delta Downs
    Willie Patin

Aaron Broussard
Broussard & Hart
1301 Common Street
Lake Charles, LA 70601
(337) 439-2450
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Claudine Labarrera
    Alberto Labarrera

Delta Downs Racetrack & Casino
    Boyd Gaming Corp.

**SAUNDERS, Judge.**

This case involves a patron who slipped and fell in the lobby of a racetrack, casino, and hotel. Video evidence shows a custodial employee spraying a cleaning substance on a dust mop prior to dust mopping the racetrack casino & hotel lobby. Thereafter, the patron is seen walking in the area where the spray was administered, slipping, and falling.

The patron's counsel discovered *ex parte* communication between the racetrack, casino, and hotel's counsel and a treating physician while that treating physician was being deposed. Thereafter, the trial court ordered that the physician's deposition could not be used at trial, that the physician's deposition be retaken, and that no mention of the first deposition be made at trial. Thereafter, the physician's second deposition is admitted into evidence at trial.

Following the trial on the merits, the jury found that the patron was 42% at fault for the accident and awarded her past medical expenses and general damages. The patron and her husband have appealed.

<u>**FACTS AND PROCEDURAL HISTORY**</u>:

On April 26, 2009, Claudine Labarrera and her husband, Alberto Labarrera, (Plaintiffs) were guests at Delta Downs Racetrack, Casino, and Hotel (Delta). Early that morning, video surveillance depicts Willie Patin, a custodial employee of Delta, spraying a cleaning substance on his dust mop prior to performing his task of dust mopping the lobby.

The substance that Patin was shown spraying onto his dust mop is designed to enhance the dust mop's performance. One of the ingredients in the substance is oil. When present on certain flooring, such as wood in this case, the substance can cause the floor to become slippery.

Shortly after Patin is shown spraying the substance on his dust mop, video surveillance shows Claudine slipping and falling while walking with Alberto. The video shows that Claudine slipped and fell in the location where Patin sprayed the performance-enhancing substance onto his dust mop.

Plaintiffs brought a personal injury action against Patin and Boyd Racing, L.L.C., d/b/a Delta Downs Racetrack, Casino, and Hotel (collectively "Boyd") alleging that Claudine was injured in her slip and fall and that Alberto suffered a loss of consortium as a result of Claudine's injury. Boyd answered and alleged that Claudine was contributorily negligent in causing the accident.

Claudine was treated for pain in multiple areas of her body by numerous physicians. During the deposition of one of her treating physicians, Dr. Kim Gargas, Plaintiffs' counsel learned that an employee of Boyd's counsel sent Dr. Gargas a cover letter and a selection of Claudine's medical records for him to review in anticipation of his deposition. Plaintiffs filed a motion *in limine* to prevent Dr. Gargas' deposition from being admitted into evidence at trial. The trial court ordered that Dr. Gargas' first deposition could not be used at trial, that Dr. Gargas' deposition be retaken, and that no reference to Dr. Gargas' first deposition, nor the fact that it had to retaken, was to be made in front of the jury.

A jury trial commenced on December 3, 2012, and continued for two weeks. Prior to the case going to the jury for consideration, Plaintiffs filed a motion for directed verdict on the issue of comparative negligence. The trial court denied this motion. After deliberations, the jury returned a verdict allocating 58% fault for causing Claudine's accident to Boyd and 42% to Claudine. The judgment awarded Plaintiffs, *inter alia*, $39,851.80 for past medical expenses, $0.00 for future medical expenses, $10,000.00 for past and future loss of enjoyment of life, $30,000.00 for past and future physical pain and suffering, $15,000.00 for past and

future emotional distress, and $0.00 for permanent disability for Claudine's injuries she sustained in her slip and fall.

Plaintiffs appealed the judgment. They have alleged the following:

## ASSIGNMENTS OF ERROR:

1. The [t]rial [c]ourt's denial of Plaintiffs' motion for directed verdict on contributory negligence regarding Claudine's shoes.

2. The [j]ury finding contributory negligence.

3. The [t]rial [c]ourt's failure to exclude a treating physician who changed his opinions after having *ex parte* communications with a defendant and reviewed medical records from other providers without authorization or notice.

4. The [j]ury's failure to award proven past and future medical expenses.

5. The [j]ury's failure to award fair and adequate general damages.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO:

In their first assignment of error, Plaintiffs contend that the trial court's denial of their motion for directed verdict on comparative negligence regarding Claudine's shoes was in error. Plaintiffs assert in their second assignment of error that the jury erred in finding that Claudine was comparative negligent in causing her accident. As both assignments deal with potential comparative negligence by Claudine, we will address them under one heading.

"[T]he applicable standard of review on a motion for directed verdict is whether the evidence in the record is such that a reasonable person could not reach a verdict to the contrary." *Richard v. Artigue*, 11-1471, p. 4 (La.App. 3 Cir. 4/4/12), 87 So.3d 997, 1001 (citing *Hebert v. BellSouth Telecomms., Inc.*, 01-223 (La.App. 3 Cir. 6/6/01), 787 So.2d 614). Similarly, the standard to review of an allocation of fault by a factfinder is that of the manifest error. *Richard*, 87 So.3d 997 (citing *Duncan v. Kansas City S. Ry. Co.*, 00-66 (La. 10/30/00), 773 So.2d 670.

Prior to negating a finding of fact under the manifest error standard, "an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous." *Bonin v. Ferrellgas, Inc.*, 03-3024, pp. 6-7 (La. 7/2/04), 877 So.2d 89, 94-95 (citing *Stobart v. State through Dep't. of Transp. and Dev.*, 617 So.2d 880 (La.1993)).

In the case before us, Boyd asserted fault on the part of Claudine in each of the numerous answers it submitted to Plaintiffs' petition and subsequent amendments. A party asserting comparative negligence has the burden to prove that fact. *McCarthy v. Entergy Gulf States, Inc.*, 11-600 (La.App. 3 Cir. 12/7/11), 82 So.3d 336, *writ denied*, 12-72 (La. 3/9/12), 84 So.3d 553. As such, when reviewing the trial court's denial of Plaintiffs' motion for directed verdict, we must look to the record to determine whether a reasonable person could reach a verdict contrary to finding that Boyd failed to carried its burden to prove that Claudine was contributorily negligent. Stated more clearly, we must ask whether a reasonable person could find that Boyd carried its burden to prove that Claudine had any comparative negligence. Similarly, under assignment of error number two, we must look to the record to determine whether a reasonable factual basis exists for the jury's finding that Boyd carried its burden to prove that Claudine was contributorily negligent, and, if not, whether the jury was clearly wrong in reaching this conclusion. All of these considerations entail this court reviewing the record to determine the reasonableness in finding that Boyd carried its burden to prove that Claudine was contributorily negligent.

At trial, Boyd alleged several factors regarding Claudine's comparative negligence for her slip and fall. Those factors were Claudine's shoes, gait, impairment, failure to safely traverse a flooring change from carpet to wood, and

failure to see Patin's cart, which should have served as a warning to her that the condition of the floor was potentially dangerous.

At the close of trial, Boyd conceded that it had put forth no evidence that Claudine was impaired in any fashion. Further, it is quite clear when reviewing the record that Boyd presented no evidence that Claudine's gait was dangerous or somehow contributed to the accident. Likewise, there is no evidence in the record that Claudine had any trouble traversing the change in flooring from carpet to wood, nor is there any evidence that Claudine was negligent in making the transition.

There is dispute between the parties whether Claudine could have seen Patin's cart as she was walking. However, a resolution to this dispute is not necessary.

Boyd presented the expert testimony of Mr. Sonny Launey, a civil engineer. The following exchange took place in Launey's testimony:

Q     The cart is not a substitute for [] a wet floor sign or other kind of warnings; correct?

A     If you indeed are going to place a warning, you should place a warning sign, yes, sir.

Q     A cart is not a substitute[?]

A     No, sir.

This testimony by Boyd's expert does not establish that Patin's cart was a sufficient warning. Quite the contrary, it promotes the opposite, regardless of whether Claudine could have seen the cart prior to her fall. Accordingly, it is clear that no reasonable person could conclude that Boyd carried its burden to prove that Claudine was contributorily negligent in failing to heed the concededly inadequate warning, if any, provided by Patin's cart.

5

The final factor alleged by Boyd was that Claudine's shoes were dangerous, and that she was negligent in wearing these dangerous shoes. Boyd contends that Launey's testimony provides a basis for finding that Claudine's shoes were dangerous. We note that at the beginning of Launey's testimony, the following exchange took place (emphasis added):

Q   All right. After considering all of that information, what conclusions did you reach about the cause of this accident?

A   Well, I really don't know what caused the accident. I'll straight out say that. There are a number of factors that I think ***could*** have contributed, and I think should be considered.

Thereafter, regarding Claudine's shoes and any causation of her slip and fall, Launey stated, "I'm not saying the shoes caused the accident . . . . I just think it's something to consider. Those hard, plastic-soled shoes are - - I think, ***can*** contribute to an accident. I don't know the role. I can't and I will not specifically say that's what caused this accident" (emphasis added).

We find this testimony by Launey is insufficient. His statement that shoes such as Claudine's "could" or "can" contribute to a slip and fall is not a reasonable foundation to find that Boyd carried its burden to prove that Claudine's shoes were dangerous.

Additionally, in reviewing Launey's testimony, he stated that he conducted no tests of any kind in preparation for the litigation. Rather, he simply states that he "didn't like" Claudine's shoes. Originally, Launey opined that plastic-soled shoes were inferior to rubber-soled shoes when considering how easily one can slip and fall while walking in them. Later, Launey testified that the heel was the most important part of a shoe when making this consideration. Thereafter, when presented with one of Claudine's shoes that she was wearing when she slipped and

fell, Launey discovered that the heel of her shoe was the preferred rubber, rather than the much maligned plastic.

Given Launey's testimony as a whole, it is evident why he did not state that Claudine's shoes were dangerous and likely a contributing factor in her slip and fall. Not only had he had not conducted a single test of any kind, he had never looked at them, nor was he completely aware of their comprising materials.

Importantly, not even considering that Boyd failed to prove that Claudine's shoes were dangerous, it also has to show that Claudine was somehow negligent by wearing the allegedly dangerous shoes. The record is absolutely devoid of any evidence of even a theory as to how Claudine was negligent in wearing these shoes.

Finally, Boyd points to no other evidence that it contends supports either the trial court denying Plaintiffs' motion for directed verdict or the jury's finding of comparative negligence by Claudine. Further, this court has conducted a thorough review of the record, and we find no evidence to support a determination that Boyd carried its burden to prove contributorily negligence by Claudine in causing her slip and fall. Accordingly, we amend the jury's allocation of fault to Claudine for this accident from 42% to 0%.

**<u>ASSIGNMENT OF ERROR NUMBER THREE</u>:**

In their next assignment of error, Plaintiffs assert that the trial court's failure to completely exclude the testimony of a treating physician who changed his opinions after having *ex parte* communications with a defendant and reviewed medical records from other providers without authorization or notice was in error. We do not agree.

"The trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal absent an abuse of that discretion." *McIntosh v. McElveen*, 04-1041, pp. 9-10 (La. App. 3 Cir. 2/2/05), 893

So.2d 986, 994, *writ denied*, 05-528 (La.4/29/05), 901 So.2d 1069; *see also Maddox v. Omni Drilling Corp.*, 96-1673 (La. App. 3 Cir. 8/6/97), 698 So.2d 1022, *writ denied*, 97-2766, 97-2767 (La.1/30/98), 709 So.2d 706, and *Wood v. American National Prop.& Cas. Ins. Co.*, 07-1589 (La. App. 3 Cir. 12/23/08), 1 So.3d 764.

It is uncontradicted that an employee of Boyd's counsel sent part of Claudine's medical records to Dr. Gargas on the day of Dr. Gargas' first deposition to help him prepare. Plaintiffs' counsel discovered this during Dr. Gargas' first deposition. Thereafter, Plaintiffs filed a motion to exclude Dr. Gargas' testimony from the trial. The trial court ruled that Dr. Gargas' first deposition was excluded from evidence at trial. It also barred any discussion of the contents of Dr. Gargas' first deposition and any discussion of the fact that it had to be retaken in front of the jury. Further, the trial court ruled that Dr. Gargas' deposition was to be taken a second time. That second deposition was entered into evidence at trial in lieu of Dr. Gargas' live testimony.

According to Plaintiffs, these facts establish that Boyd's counsel and Dr. Gargas violated La.Code Evid. art. 510. Plaintiffs also assert that this violation influenced Dr. Gargas to find no causation between Claudine's accident and her pain. Plaintiffs base their assertion regarding influence on the allegation that Dr. Gargas' opinion regarding causation in both depositions differed from his notes included in Claudine's medical records. Because Plaintiffs contend that the *ex parte* communication permanently tainted Dr. Gargas' testimony, and the integrity of the trial as a whole, they ask this court to reverse the judgment of the jury and perform a *de novo* review of the record under *Boutte v. Winn-Dixie La, Inc.*, 95-1123 (La.App. 3 Cir. 4/17/96), 674 So.2d 299, *Coutee v. Global Marine Drilling Co.*, 04-1293 (La.App. 3 Cir. 2/16/05), 895 So.2d 631, *rev'd on other grounds*, 05-

8

756 (La. 2/22/06), 924 So.2d 112, and *Ernst v. Taylor*, 08-1289 (La.App. 3 Cir. 5/6/09), 17 So.3d 981, *writ denied*, 09-1262 (La. 9/18/09).

We agree with Plaintiffs that a violation of La.Code of Evid. art. 510 occurred. Louisiana Code of Evidence Article 510(B)(1) establishes the privilege that Claudine has regarding her medical records. Her privilege is then specifically listed as an exception under La.Code Evid. art. 510(B)(2)(a), as Claudine has asserted a personal injury claim. However, under La.Code Evid. art. 510(E), that exception is limited to "testimony at trial or to discovery of the privileged communication by one of the discovery methods authorized by Code of Civil Procedure Article 1421 et seq." La.Code Evid. art. 510(E). Here, an employee of Boyd's counsel wrote a cover letter and faxed Claudine's medical records from other providers to Dr. Gargas prior to the first deposition, and Dr. Gargas reviewed those records. This is not a discovery method authorized by La.Code Civ.P. art. 1421 et seq. Therefore, it is clear that Dr. Gargas and Boyd's counsel, through an employee, violated La.Code Evid. art. 510.

We note that there is a view present in our sister court that there is nothing in La.Code Evid. art. 510, or any other statute applicable to this issue, to "preclude, prevent, or prohibit the flow of information *from* a litigant, an attorney, or anyone else for that matter *to* a health care provider." *Hortman v. La. Steel Works*, 96-1433, p. 6 (La.App. 1 Cir. 6/20/97), 696 So.2d 625, 628, *writ denied*, 97-1919 (La. 11/7/97), 703 So.2d 1268 (emphasis in original). In *Hortman*, the first circuit, announced this view quoted above, and found no violation of La.Code Evid. art. 510. Thereafter, the first circuit asserted that regardless of whether La.Code of Evid. art. 510 was violated, La.Code Evid. art. 510(G) provides for sanctions against the attorney, not the litigants, and any violation of La.Code Evid. art. 510 should never result in evidence exclusion.

The supreme court has not addressed whether evidence exclusion is proper for a violation of La.Code Evid. art. 510. However, it is clear from the jurisprudence of this court that evidence can be excluded due to improper *ex parte* communication. See *Sloan v. Mouton*, 11-804 (La.App. 3 Cir. 12/7/11), 82 So.3d 364, *writ denied*, 12-48 (La. 3/9/12), 84 So.3d 556; *Peoples v. Fred's Stores of Tennessee, Inc.*, 09-1270 (La.App. 3 Cir. 6/2/10), 38 So.3d 1209, *writ denied*, 10-1882 (La. 10/29/10), 48 So.3d 1090; *Ernst*, 17 So.3d 981; *Coutee*, 895 So.2d 631; and *Boutte*, 674 So.2d 299.

From that jurisprudence, we ascertain that when adjudicating whether to uphold a judgment rendered when a violation of La.Code Evid. art. 510 occurs and tainted evidence is admitted, we have to look at the totality of the circumstances to observe whether the integrity of trial was impacted such that a pall is cast on the proceedings. *Boutte*, 674 So.2d 299; *Coutee*, 895 So.2d 631; *Ernst*, 17 So.3d 981.

One factor universally studied when considering the totality of the circumstances has been whether the aggrieved party had sufficient notice to gather and present contradicting evidence to rebut the evidence that stemmed from the violative *ex parte* communication. In every case but one, *Sloan*, 82 So.3d 364, if the aggrieved party did not receive sufficient notice and the evidence was improperly considered at trial, we vacated the judgment and performed a *de novo* review of the record. The *Sloan* court differed because the testimony resulting from the violative *ex parte* communication had no impact on the finder of fact. This is a well-reasoned exception, as the improper consideration of the evidence made no difference in the result.

Other factors weighed by some panels were whether the credibility of the aggrieved party was attacked by the tainted evidence, whether the physician's opinion changed due to information procured by participating in the violative *ex*

10

*parte* communication, and whether the physician's opinion was unique. Additionally, we have two cases where the question has been posed whether the litigant participating in the violative *ex parte* communication should be allowed to benefit from that communication in any fashion. *See Peoples*, 38 So.3d 1209 and *Wood v. Am. Nat'l Prop. and Cas. Ins. Co.*, 07-1589 (La.App. 3 Cir. 12/23/08), 1 So.3d 764.

In the case before us, Plaintiffs discovered the violation during Dr. Gargas' first deposition. The trial court excluded that deposition and ordered Dr. Gargas to be deposed a second time. Thus, any prejudice due to lack of notice was negated when Plaintiffs had the opportunity to cross-examine Dr. Gargas at the second deposition and the opportunity to pursue and prepare evidence to rebut Dr. Gargas' testimony from that second deposition. Given the sequence of events, we find that Plaintiffs had sufficient notice of the violative *ex parte* communication.

Next, we consider whether Claudine's credibility was attacked by Dr. Gargas' testimony. Plaintiffs argue that Dr. Gargas' testimony was used to attack Claudine's credibility because Boyd asserted that Claudine was doctor-shopping for a physician who would perform surgery on her and Claudine looked for another opinion after Dr. Gargas opined that she was not a surgical candidate at that time.

It is true that Claudine sought a second opinion after Dr. Gargas concluded that she was not a surgical candidate at that time. However, Dr. Gargas' did not state that Claudine sought a second opinion in order to find a physician who would perform surgery on her. He gave no opinion as to why Claudine sought a second opinion and only stated that it was common for patients to seek second medical opinions. Further, there is no testimony by Dr. Gargas that Claudine was anything but truthful in his treatment of her. He simply opined that he did not think Claudine was a surgical candidate when last he saw her. Additionally, Boyd's

11

assertion that Claudine was doctor-shopping is bolstered more by the number of physicians that treated her than the fact that she got a second opinion while treating with Dr. Gargas. Accordingly, we find that any attack on Claudine's credibility by Dr. Gargas' testimony was minimal.

Next, we consider whether Dr. Gargas' opinion was unique. Claudine saw several physicians over the course of her treatment. We will discuss the opinions of many below while adjudicating different assignments of error. The records shows that a number of those physicians were of the opinion that Claudine's pain was not caused by her slip and fall. Therefore, Dr. Gargas' opinion was not unique.

Finally, we consider whether Dr. Gargas' opinion changed due to information procured by participating in the violative *ex parte* communication. It is true that Dr. Gargas' opinion may have changed due to information from the violative *ex parte* communication. The fact that a different treating physician diagnosed Claudine with fibromyalgia may have changed Dr. Gargas' opinion about what was causing Claudine's pain. However, that fact would have been brought to light during Dr. Gargas' deposition, and he could have reached the same opinion once he learned of the diagnosis in the normal fashion during his deposition. Further, after reviewing Dr. Gargas' medical records, we find it just as likely, if not more so, that Dr. Gargas' opinion was changed during the course of his treatment of Claudine and, in his view, superior diagnostic testing.

Early in treating Claudine, Dr. Gargas' working diagnosis was that Claudine had suffered her pain from the injuries incurred from her slip and fall. He mainly based his opinion on the history that Claudine gave to him and the results of an MRI that she underwent prior to his treating her. Over the course of treating her, Dr. Gargas had Claudine undergo a second MRI because he felt that the first MRI's angle in viewing Claudine's lumbar discs was not optimal. According to Dr.

12

Gargas, he changed his diagnoses based on the results of that second MRI. Given this explanation by Dr. Gargas for the changing of his diagnosis, we cannot say that his opinion was changed as a result of the violative *ex parte* communication.

In summation, while we find that Boyd's attorney did violate La.Code Evid. art. 510, it is clear that Plaintiffs were notified of this violation with ample time to counteract any prejudice created by the *ex parte* communication. We also find that any attack in Dr. Gargas' testimony on Claudine's credibility was minimal, if at all. Further, Dr. Gargas' opinion was not unique, and did not necessarily change due to information obtained in the violative *ex parte* communication.

Accordingly, we find no abuse of discretion by the trial court in admitting Dr. Gargas' second deposition into evidence. Further, given the totality of the circumstances, we find that the integrity of the trial was intact despite the violation of La.Code Evid. art. 510. As such, we find no merit to Plaintiffs' assignment of error number three.

## ASSIGNMENT OF ERROR NUMBER FOUR:

In their next assignment of error, Plaintiffs contend that the jury's failure to award proven past and future medical expenses was in error. We find no merit to this contention.

> An award of special damages is reviewed pursuant to the manifest error standard of review, unlike a general damage award which is reviewed pursuant to the abuse of discretion standard. *Hornsby v. Bayou Jack Logging*, 03-1544 (La.App. 3 Cir. 5/5/04), 872 So.2d 1244. Thus, "[t]he adequacy or inadequacy of the award should be determined by the facts or circumstances of the case under consideration." *Id*. at 1248. The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. *Id*.

*Savant v. Hobby Lobby Stores, Inc.*, 12-447, p. 13 (La.App. 3 Cir. 11/7/12), 104 So.3d 567, 575.

In the case before us, Claudine's medical records indicate minimal preexisting pain that was not related to the pain that she endured after her slip and fall. They also indicate that she had preexisting degenerative conditions throughout her body, including arthritis. After her fall, Claudine developed carpal tunnel syndrome, trigger finger in her thumb, and cubital tunnel syndrome.

Claudine had surgery to relieve her carpal tunnel syndrome, trigger finger, and cubital tunnel syndrome. That surgery was performed by Dr. Jeffery Budoff, an upper extremities orthopedic specialist. He opined that Claudine's ailments for which he was seeing her were not typically caused by trauma. He also stated that if these symptoms were caused by trauma, he would expect to see evidence of that trauma in Claudine's medical records from her emergency room visit the night after the fall, but he testified that there was no indication of any such trauma noted in those records. Accordingly, we find no error by the jury in failing to award Plaintiffs for treatment related to carpal tunnel syndrome, trigger finger in her thumb, and cubital tunnel syndrome.

Further, after the fall, Claudine saw many physicians with complaints of pain in numerous locations including her low back and legs. Claudine underwent surgery on her back twice. Her first back surgery was a three-level foraminotomy, a surgery that widens the openings where nerve roots leave the spinal canal. Her second was the insertion of a spinal cord stimulator.

Dr. Stephen Esses, an orthopedic surgeon, decided to perform the three-level foraminotomy in an attempt to alleviate Claudine's low back and leg pain. After Dr. Esses' surgery, a spinal cord stimulator was inserted into Claudine's lower back by Dr. Jerry Keepers, an invasive pain management specialist. He inserted the device to alleviate Claudine's lower back and leg pain. Additionally,

14

Claudine's request for future medical expenses was related to potential surgeries to replace the spinal cord stimulator inserted by Dr. Keepers.

Given that the reason for the two surgeries and the stated reason for the potential future surgeries was alleviation of Claudine's low back and leg pain, if the jury could reasonably find that the source of Claudine's persistent low back and leg pain was not her slip and fall, it could also reasonably find that Claudine was not entitled to most, if not all, of her requested medical expenses.

In reviewing the record, we find conflicting expert evidence on the source of Claudine's low back and leg pain. Dr. Miguel Papolla, a neurologist who Claudine treated with of her own volition, performed an extensive ninety-minute examination of Claudine. He diagnosed her with fibromyalgia, a chronic disorder characterized by widespread musculoskeletal pain, fatigue, and tenderness in localized areas. He opined that Claudine's fibromyalgia was the source of her pain and that it was not caused by Claudine's slip and fall.

Claudine was also seen by pain specialists, Dr. Ranjit Patel and Dr. Lilly Chen. She was treated at their office over twenty times over a year and a half. In reviewing Claudine's records from her treatments, the diagnosis of fibromyalgia was indicated each time.

Plaintiffs argue that a diagnosis of fibromyalgia is improper after a slip and fall. Regardless of whether Plaintiffs' position has merit, they argued it to the jury. Thus, the jury was aware of Plaintiffs' argument and proof thereof and was in a position to properly evaluate what value, if any, to give to Claudine's fibromyalgia diagnoses.

Further, Plaintiffs contend that the findings of Drs. Patel and Chen are of limited or no value because the medical records contain indications of many diagnoses, including one visit where multiple sclerosis was diagnosed. In

reviewing these records, it is true that the record dated July 29, 2011, shows a mark next to multiple sclerosis indicating it as a diagnosis. However, the location where the physician would indicate a diagnosis of fibromyalgia is just above multiple sclerosis. Additionally, the location where a physician would indicate a diagnosis of arthritis is just below that of multiple sclerosis. In each visit, fibromyalgia and arthritis are indicated. Thus, it is likely that this multiple sclerosis "diagnosis" was nothing more than an erroneous mark, and Plaintiffs' attempt to discredit these records is not well founded.

Finally, Claudine was examined by a neurologist, Dr. Hugo Orellana. He opined that the source of Claudine's pain was myofacial pain syndrome and not from any injuries she endured as a result of her slip and fall.

Given these testimonies, the jury could reasonably have found that the source of Claudine's low back and leg pain was not her slip and fall. As such, the jury's exclusion of those expenses related to treating Claudine's low back and leg pain was reasonable.

In conclusion, we find that the expert medical testimony provides the jury with a reasonable basis to exclude any expenses related to Claudine's treatment of carpal tunnel syndrome, trigger finger, or cubital tunnel syndrome. We also find that there is a basis for the jury to exclude expenses associated with treating Claudine's low back and leg pain from it award to Claudine's for her past medical expenses. Finally, we find that the medical testimony in the record also provides the jury with a basis for not awarding Claudine any future medical expenses. Given these findings, we cannot say that the jury was manifestly erroneous in either its award to Claudine for her past medical expenses or in its lack of award to Claudine's for her future medical expenses, as it was reasonable for the jury to

have found that Claudine only suffered soft tissue injuries that had resolved by the time of trial. As such, we find no merit to Plaintiffs fourth assignment of error.

## ASSIGNMENT OF ERROR NUMBER FIVE:

Finally, plaintiffs assert that the jury's award of general damages was inadequate. Again, we find no merit to this assignment of error.

An award of general damages is reviewed under the abuse of discretion standard of review. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

We found in assignment of error number four that a reasonable basis exists for the jury to believe that Claudine's low back and leg pain were not caused by her slip and fall. Also in assignment of error number four, we found that Claudine's carpal tunnel syndrome, trigger finger in her thumb, and cubital tunnel syndrome could reasonably have been found by the jury to be unrelated to her slip and fall. As such, a view of the medical evidence exists to support the jury's finding that Claudine only suffered soft tissue injuries in her slip and fall. The jury's award of general damages is in accord with such awards, and we find no abuse of the jury's discretion.

## CONCLUSION:

Plaintiffs, Claudine Labarrera and her husband, Alberto Labarrera, assert five assignments of error. We combine the first two assignments because they both raise the issue of the jury's allocation of fault to Claudine Labarrera for her slip and fall. We find that no reasonable person could ascertain that Boyd carried its burden to prove any fault by Claudine Labarrera. As such, we amend judgment of the jury to reflect that Boyd is 100% at fault for Claudine's slip and fall.

We find no merit to third assignment of error. While Boyd's attorney violated La.Code Evid. art. 510, the violation, and subsequent admission of Dr.

17

Gargas' second deposition, was not an abuse of the trial court's discretion and did not warrant reversal of the jury's judgment.

Finally, we find no merit to assignments four and five. The jury's damage awards are adequately supported by the record.

**AFFIRMED, AS AMENDED.**

CLAUDINE LABARRERA, ET UX.

VERSUS

BOYD GAMING CORPORATION, ET AL.

**GREMILLION, Judge, concurring.**

The majority finds manifest error in the jury's verdict and assesses the casino 100% fault. Otherwise, the majority makes no changes to the total amount of the verdict. I agree with these portions of the opinion.

There really was no evidence supporting any negligence on the part of the plaintiff. Even the defense expert could only speculate that she might have or could have contributed to the fall. The lack of evidence in the record requires us to place all of the fault on the defendant.

I concur because I believe the issue of whether Louisiana Code of Evidence article 510 was violated, and the effect of this violation, needs exploration and explanation. Initially, I will state my unequivocal agreement with the majority that any violation that may have occurred resulted in no prejudice to the plaintiff. Plaintiff could not possibly have expected that Dr. Gargas would not have been exhaustively cross-examined on the medical records that were sent to him. Sooner or later, those records were going to find their way into Dr. Gargas's hands.

Article 510 takes, then gives, then takes again. Paragraph (B)(1) clearly takes away a defense attorney's right to communicate with a plaintiff's health care provider, and vice versa. The patient has a privilege to refuse to disclose, and to refuse *another person* to disclose, confidential communications between himself and his health care provider. Another person would include the casino's attorney.

However, Paragraph (b)(2)(A) states that there is no privilege when the communication relates to the health condition of a personal injury or workers' compensation claimant.. Finally, Paragraph (E), entitled "Waiver," provides that the exceptions in Paragraph (B)(2) only apply to trial testimony or a discovery method authorized by La.Code Civ.P. arts. 1421, et seq. Ultimately, what this "waiver" does is clearly allow the defense attorney to communicate with the plaintiff's health care provider, but only through proper means of discovery.

In this case, the defense attorney's employee communicated with the plaintiff's health care provider by providing other medical records to the doctor to prepare him for his deposition the next day. Thus, there are actually two technical violations of Article 510. First, the communication with this particular health care provider did not take place within a deposition or a trial. Secondly, the communication included other health care records for which the plaintiff also had a privilege.

I call this a "technical" violation to demonstrate how minor I really think it was. Yes, the attorney's employee should not have engaged in that communication, and Dr. Gargas should not have received the medical records from the defense attorney outside the deposition. However, the records were only being provided for the purpose of preparing for the deposition during which the communication between the doctor and the defense attorney and the presentation of those very same medical records would have been absolutely appropriate. The "violation" resulted only in the doctor being made aware of information a few hours earlier than would have been technically proper, and only for the purpose of being better prepared to participate in the proper deposition.

Ms. Laberrera suggests that all of this resulted in a large amount of unfair surprise. I completely disagree. Again, she had to anticipate that Dr. Gargas

would be asked to discuss these very medical records at his deposition.  To strike Dr. Gargas's deposition would, in my opinion, subvert justice by concealing from the jury evidence that is completely relevant to the case and that was otherwise fairly obtained.